**LOCAL NO. 104, SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, AFL–CIO, et al., Petitioners-Appellees,**

v.

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Respondent-Appellant.**

**LOCAL NO. 104, SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, AFL–CIO, et al.,**

v.

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Respondent-Appellee.**

**Nos. 24096, 24136.**

United States Court of Appeals, Ninth Circuit.

Feb. 25, 1971.

Rehearings Denied April 1, 1971.

238

Peter Adomeit (argued), of Neyhart, Grodin & Beeson, San Francisco, Cal., for appellant.

David R. Cashdan (argued), Washington, D. C., for appellee.

Before MADDEN,\* Judge of the United States Court of Claims, KOELSCH and KILKENNY, Circuit Judges.

MADDEN, Judge:

The Equal Employment Opportunity Commission is a Federal Administrative Agency created by the provisions of Title VII of the Civil Rights Act of 1964, 78 Stat. pp. 253 ff, 42 U.S.C. §§ 2000e ff.[1] The objective of Title VII was to eliminate discrimination in employment based upon race, color, national origin, etc. House Bill, HR 7152, which developed into the statute involved in the instant litigation appears in House Report No. 914, House Judiciary Committee Report on HR 7152, 88th Cong., 1st Sess. That bill provided for a Commission, the Equal Employment Opportunity Commission, EEOC, with power not only to hear and conciliate cases involving discrimination in employment based upon the grounds named above, but also to initiate enforcement proceedings, compara-

---

\* J. Warren Madden, Senior Judge of the United States Court of Claims, sitting by designation.

1. The footnote references to the statute hereinafter will be to the pertinent sections of Title VII, as they appear in 78 Stat. pp. 253 ff.

ble to those provided for in the National Labor Relations Act [2] which relate to discrimination on account of labor union activities, which proceedings could lead to quasi-judicial determination by the EEOC forbidding future discriminations and granting reparations for past discriminations.

HR 7152 was passed by the House of Representatives. In the Senate, however, it was drastically amended by removing from the EEOC the power to hold hearings and issue orders. In effect, the bill as amended by the Senate, and enacted by Congress, left in the Commission only the authority to *investigate* charges of violations of statute § 706(a) and provided that if, as a result of such investigation, the EEOC concluded that there was reasonable cause to believe that the charges were true, the EEOC should endeavor to eliminate such practices by informal methods of conference, conciliation and persuasion. If such endeavors were unsuccessful, the Commission should notify the person who filed the charge, who might then file a civil action against the entity which was alleged to have violated § 706(e) of the Equal Employment Opportunity statute and should make a recommendation to the Attorney General that he institute judicial proceedings to prevent certain types of such violations. The proceedings and debates in the Senate leading to the changes in the House Bill are discussed in VAAS, Title VII, Legislative History, VII Boston College Indus. and Comm.L.Rev. 452 (1966).

As enacted, after the amendments, the statute in brief provided that if an individual claimed that he had been discriminated against for a reason condemned by the statute, he could file with the Commission a written charge under oath, the Commission should furnish a copy of the charge to the employer, employment agency, or labor union against whom or which the charge was directed, and should then investigate the charge, but not make it public. "If the commission shall determine, after such investigation, that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation and persuasion." Section 706(a). Section 706(e), provides that after 30 or in certain circumstances not more than 60 days after the charge was filed, if conference, conciliation and persuasion has not been successful, "the Commission shall so notify the person aggrieved and a civil action may, within thirty days thereafter, be brought by the person aggrieved, as hereinabove stated." The statute provides that, upon timely application, the court may, in its discretion, permit the Attorney General to intervene in such civil action if the Attorney General certifies that the case is of general public importance.

We have discussed the function of the Commission in cases in which a charge is filed by an individual.[3] Returning now to the introductory language of § 706(a), and its provisions about the filing of charges, we quote from the section, "whenever it is charged in writing under oath by a person claiming to be aggrieved, or a written charge has been filed by a member of the Commission where he has reasonable cause to believe a violation of this title has occurred, *(and such charge sets forth the facts upon which it is based)* that an employer, employment agency * * *". The remainder of § 706(a) has been quoted hereinabove, in relation to charges filed by individuals. Local 104 stresses the language which is in parentheses in the statute, and which we have italicized, as having special significance.

In the instant case the charge *was* filed by a member of the EEO Commission, Commissioner Jackson. His amended charge, naming Local 104, and

---

2.  29 U.S.C. § 141 ff.

3.  We do not mean to say that more than one individual may not be involved in the kind of case discussed above.

the Sheet Metal Joint Apprenticeship Committee (SMJAC) as the entities charged, said "I have reasonable cause to believe that the above mentioned respondents * * * have violated (here he named the sections of the Act and asserted the Commission's jurisdiction). The following practices have occurred."

That the respondents * * * have historically, and subsequent to the effective date of Title VII of the Civil Rights Act of 1964 discriminatorily restricted union membership of minority group members because of race or national origin.

After the filing of the charge with the Commission, the Commission served upon Local 104 and upon SMJAC a two page document entitled "Demand for Access to Evidence." The document began with this language:

"Pursuant to Section 710 of the Civil Rights Act of 1964, you are hereby required and directed to grant, within five days after receipt of this demand, to (two named duly authorized representatives of the Commission), access to the following evidence in your possession or control for the purpose of examination and copying." Then were written fifteen numbered paragraphs, nine of which called for lists of names and the other six called for various documents. Section 710 of the statute cited at the beginning of the demand is a rather conventional example of the kind of authorization appearing in many statutes conferring upon government agencies access to records for examining and copying.

Within the appropriate time after the demand was received, Local 104 filed in the District Court a "Petition for an Order to set Aside the Commission's Demand for Production". Such a petition is authorized by § 710(c) of the Act. The EEOC filed its answer to the petition of Local 104 [4] and also a "Petition

for an Order to Enforce the Commission's Demand for Production of Documents, Evidence and Personnel." Authority for such a petition is found in § 710(b) of the Act.

The District Court, having received briefs and heard oral argument of the parties, entered its order enforcing the demand of the EEOC for access to information but with the proviso that the Court's order did not cover information pre-dating the effective date of the Civil Rights Act of 1964. Local 104 has appealed from the District Court's order of enforcement. EEOC has cross-appealed from the proviso inserted by the District Court in its enforcement order.

■ The first point urged by Local 104 in its appeal may be restated as follows: The charge which set the EEOC's machinery in motion was a charge made by a Commissioner. But, says Local 104, the charge was based upon "a Pattern or practice of discrimination not upon a particular instance of discrimination." Local 104 says that a Commissioner has no authority to file a charge based upon a "pattern or practice of discrimination", therefore there was no authorized charge; therefore the first step which might have set in motion the Commission's investigative machinery was never taken; therefore EEOC's demand for access to records had no legitimate procedural ancestry and was itself illegitimate and unenforceable.

The ground of appeal recited in the foregoing paragraph is based by Local 104, not upon the text of the enacted statute but upon certain items of legislative history. It may be said at the outset that it would have been most remarkable for Congress, having, by means of the Senate amendments, stripped away all of the powers of decision which the Commission would have had under the House Bill, and left to the Commission only the authority to inves-

---

4. In general, throughout their brief, the petitioners-appellants mention only Local 104, and do not mention SMJAC. We assume that the omission is merely for brevity, and that SMJAC is a petitioner-appellant although not specifically named on every appropriate occasion.

tigate and to mediate, to have also taken away the Commission's power to investigate in perhaps the most important area of racial discrimination, the area of "pattern or practice". The result would have been that the expertise which the Commission would be expected to have, or to acquire by working in the field of racial discrimination in labor relations could not be used at all in this vital but delicate and subtle area.

Local 104 quotes language of Senator Humphrey, who managed the bill through the Senate deliberations, and who stressed the fact that although the House Bill had given powers of enforcement of the law to the Commission and the Courts, under the Senate Amendments only the Attorney General could speak for the Government in litigation about the rights created by the amended bill. He said, correctly, that the amended bill, by § 707 authorized the Attorney General to institute suit in practice or pattern cases. The statute, as enacted, contains § 705(f) (6) which provides, in pertinent part:

> The Commission shall have the power * * * (6) to refer matters to the Attorney General with recommendations for * * * the institution of a civil action under § 707, and to advise, consult and assist the Attorney General on such matters.

Section 705(g) (6), in the enacted statute, does not permit the inference which Local 104 would have us draw from statements made in Congressional debates. If the Attorney General, urged by some person to follow-up rumors of a widespread belief that, for example, Local 104 followed a general practice or pattern of racial discrimination, asked the Commission what information or records it had on the subject, the Commission's answer would have to be "General, we have absolutely nothing. We are forbidden by a court made doctrine based upon some remarks made in Congressional debate, to even investigate the subject. We have no files or records

relating to it, and no access to such information."

■ The District Court was correct in concluding that the Commission's demand for information was valid and enforceable. Other courts have so held. *Mansanto v. EEOC*, 60 LC para. 9309, (S.D.Texas, 1969).

Local 104 makes another attack upon the charge filed by Commissioner Jackson which charge initiated the instant controversy. We have quoted, above, in part, § 706(a) of the statute, which relates, *inter alia*, to the filing and contents of the "charge" which initiates the Commission's actions. § 706(a) includes the following language " * * * or a written charge has been filed by a member of the Commission where he has reasonable cause to believe a violation of this title has occurred (*and such charge sets forth the facts upon which it is based*) that an employer * * * or labor organization * * * has engaged in an unlawful employment practice the Commission shall furnish such employer * * * or labor organization * * * with a copy of such charge and shall make an investigation * * *" (italics added).

Local 104 attacks the charge filed by Commissioner Jackson on the ground that the charge did not satisfy the requirement of the language which is within the parentheses in the above quotation. Local 104 interprets the parenthetical language as requiring a detailed statement of the underlying facts relative to the alleged acts of discrimination. Local 104's vigorous exhortation to the court to interpret the language quoted above to mean that the Commission, in its investigation, must not ask any questions to which it does not already know the answers, has about it the aura of another, and bygone, legal era. Local 104 plays upon the epithet "fishing expedition" as if those words were as fearsome as they once were in that other era when even so sophisticated a jurist as Mr. Justice Holmes made

use of them.[5] A useful guideline to the solution of our problem is to be found in the Supreme Court's opinion in United States v. Morton Salt Co., 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950), a case involving the investigative powers of the Federal Trade Commission. Mr. Justice Jackson wrote, for the Court:

> The only power that is involved here is the power to get information from those who can best give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law.

In these present days when discovery in advance of trial is commonly used in civil cases in the courts, and to some extent even in criminal cases, it would be incongruous for Congress to create an administrative agency to function in a new sensitive and socially and economically important field, curtail the agency's functions to the point where its only authorized activities were those of investigation of violations of its law, and the difficult and often frustrating and fruitless task of, by persuasion and compromise, attempting to induce violators to obey the law, and then, by a parenthetical clause, disable it from normal and effective investigation.

Local 104 would give to the parenthetical clause an extreme interpretation in the direction of avoiding what Local 104 calls "fishing expeditions". We think the interpretation should be in the opposite direction, the direction which would put the commission on a level with other Boards and Commissions created by the Congress and manned by persons appointed by the President and approved by the Senate to initiate a new and important public policy. We think that when a person of the stature of a Commissioner of the EEOC says that he has reasonable cause to believe that a violation of the statute, which violation consists of historically practiced racial discrimination, it is apparent that he so believes because there is common opinion among persons knowledgable in the subject, to that effect, which common opinion would not exist unless there was some plausible basis for it, sufficient to justify an investigation which would determine its truth or falsity. We are not here dealing with a subject which even remotely resembles a privilege. Local 104, along with all other unions, is the beneficiary of numerous statutes which have been energetically enforced by the Government against adverse parties, who raised, unsuccessfully, objections analogous to those here raised by Local 104. If Local 104 is violating the EEO statute, it has no right to do so, nor has it any privilege, in this non-criminal proceeding, to prevent its Government from finding out whether it is violating the law, by withholding the evidence which would be relevant in the search for the right answer to the question.

In the case of United States by Clark v. IBEW, Local No. 683, 270 F. Supp. 233 (S.D.Ohio, 1967) the court had under consideration a complaint filed by the Attorney General pursuant to § 707 of the EEO Act. Section 707 provided that the complaint "sets forth the facts upon which it is based". It will be remembered that this is almost the exact language used in the paren-

---

5. FTC v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696 (1924).

thetical clause in question in this case. The Court said, at p. 235:

> The practice of discrimination is alleged in the form of facts of defendant's dealings with Negro workers generally. What plaintiff (Attorney General) has not done is to make allegations of how defendant has acted toward specific Negroes. Contrary to the assertions of defendant, the Civil Rules do not require a plaintiff to plead evidence. Paul M. Harrod Co. v. A. B. Dick Co., 204 F.Supp. 580 (N.D.Ohio, 1962). We cannot assume that Congress intended to engraft formerly used laborious pleading-concepts on the 'notice' requirements of the Rules, nor can we assume that Congress intended to require plaintiff to set out his entire case in the complaint rather than await the trial.

We think that to require the Commission to plead evidence in a proceeding which is a step in an administrative investigation when the same language in the same statute does not require such specificity in a court action which seeks a judgment, would constitute topsy-turvy logic and we will not indulge in it.

There are many cases involving this question, concerning the statute here in question. We will not discuss them. Practically all of them are consistent with the conclusion we have reached.

The District Court, as we have said above, inserted in its order for enforcement of the Commission's Demand for Access to Evidence a proviso limiting the Commission's right to access to information concerning events which occurred subsequent to the effective date of the EEO Act, which date was July 2, 1965. The Commission cross-appealed from this limitation of the enforcement order. We think that appeal is well-founded and we reverse that part of the District Court's order. The question

has been extensively litigated, is of first rate importance, and the decision of the District Court in this case appears to be the only departure from the otherwise unanimous body of authority. We mention only a few of the cases: Local 53, etc., Asbestos Workers v. Vogler, 407 F. 2d 1047 (CA 5, 1969); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va. 1968); Dobbins v. Local 212, I.B.E.W., 292 F.Supp. 413 (D.C.Ohio, 1968). At p. 443 the Court said:

> In considering whether defendants are discriminating in violation of Title VII, evidence of the defendants' conduct prior to July 2, 1965, is relevant. Such past conduct may illuminate the purpose and effect of present policies and activities and show that policies which appear neutral are in fact designed to presently discriminate.

■ Local 104 urges that compliance by it with the District Court's order would be burdensome or even impossible in view of various vague or indefinite provisions of the EEOC's "Demand for Access to Evidence". The District Court, which will have the task of enforcing its order if controversies arise concerning it, does not share the fears of Local 104 in that regard, nor do we. Local 104 contends that there is something unique about an order to compile lists. Local 104 is mistaken. See N.L. R.B. v. Wyman Gordon, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); Standard Oil Co. of California, Western Operations, Inc. v. N.L.R.B., 399 F.2d 639 (CA 9, 1968).

The judgment of the District Court is modified, as hereinabove explained, in so far as it limited EEOC's access to evidence of events occurring after July 2, 1965, in which respect the judgment is reversed. In all other respects the judgment is affirmed.